Hear ye, hear ye, this Honorable Appellate Court for the 2nd Judicial District is now open. The Honorable Jan B. Jorgensen presiding. Yes, proceeded. Your Honor, the first case on the docket form is 2-22-0140. The people of the state of Illinois, Franklin County, meet James A. Davidson, defendant of the felon. Arguing for the appendix, Mr. Anthony J. Santella. Arguing for the appellee, Mr. Adam Rodriguez. Okay, gentlemen, are you both ready to proceed? Yes, Your Honor. Then when you're ready. Good morning, Your Honors, and may it please the Court. My name is Anthony J. Santella, and I represent James Davidson in today's case. We raised three issues on appeal. Legally inconsistent verdicts, sufficiency of the evidence, and excessive other crimes. To start, the verdicts in this case were legally inconsistent. The jury was asked to find that James performed this same act both recklessly and knowingly, that is, giving prescription pills or lansipine to K.R. This was evident throughout the entire proceedings, starting with the charge instruments, which alleged that James knowingly and recklessly caused K.R.'s death by a sole act or course of conduct. To be clear, the child endangerment charges in this case were Class III felonies, meaning the state added a sentencing enhancement requiring it to prove beyond a reasonable doubt that James' act caused K.R.'s death. Child endangerment is normally a Class A misdemeanor. But here it was charged as a Class III felony. This is corroborated by the jury instructions, where the state used a modified 11.30B instruction. That instruction put in front of the jury that they needed to find that James' action caused K.R.'s death. The jury instruction said that. How about the verdict form? Well, the verdict form, Your Honor, for endangering the life or health of a child, was just a single verdict form saying we find defendant guilty or not guilty. I think the jury instructions reflect the verdict form in that instance because the jury would have to necessarily find that James' act caused K.R.'s death in order to find him guilty. And here, because of the sentencing enhancement, one of the elements was causation. So from the charge instrument, really the start of this proceeding to the end of this proceeding, it was the state's theory and what they put forward was that there was a sole actor course of conduct. That is evident not just through the charge instrument, the jury instructions, which are related to the verdict form, the trial evidence, not to jump ahead, but look at the state's motion in Lemonade to admit evidence of other crimes or bad acts. In paragraph one of that motion, the state says that both charges, manslaughter and endangerment, are based on a single act of James giving pills to K.R. And in the sentencing memorandum filed by the state, the state said that the counts should be merged because they're based on the same conduct. Wasn't Bustamante the same one act? And how do you distinguish that from this case? Well, Bustamante raises a different question, Your Honor, because that was a case involving a one act, one crime issue that the defendant raised where there was more than one harm. I believe the harms in that case were to the officer and to the government property of the officer's car. There, the defendant was trying to get one of those convictions vacated under the one act, one crime principle, and the appellate court said that because there's separate harms here, you know, there's more than one victim, the person at the property, that, well, essentially, the one act, one crime doctrine didn't apply. And there, the state had apportioned the, well, had apportioned the conduct into the multiple counts at the trial level. So the way that this is distinguished is that this isn't a one act, one crime issue. The state already agreed at the trial level that there was one act, and the state never apportioned this conduct into multiple offenses or multiple conduct at the trial level. The state's coming here for the first time and saying that, no, it should be apportioned to salvage the conviction. Counsel, is it your position that in any single act with a single harm, that a jury could never find a reckless and knowing act at the same time? Well, that's our position for this case, Your Honor. And I think what the state could have done, for example, in this case, is you could charge the way that the state charged. If you informed the jury, you could, for example, return verdicts, finding James guilty of manslaughter but not endangerment, or find him guilty of endangerment but not manslaughter, or acquit him of both. But in this instance, where there's the sole act or course of conduct, you couldn't instruct the jury. You can find him guilty of both of these because then you have the mutually incompatible, or the, excuse me, the, yeah, mutually incompatible mental states. If it were charged differently, the same act could have had two different mental states, couldn't it? I mean, if you, you know, left the medication out for the victim to get unsupervised, would that not be a reckless? Well, I think... With the same act? I think it would depend on what the trial evidence showed, and also whether the state was putting forward that evidence at trial. And here, that's just simply not the case. Right. No, I appreciate that. But I'm saying if they had put that out, you would have the same act but with two different mental states because of two separate acts, correct? I mean, it's kind of like a Boozer Monty, if you will. I don't think so because then the harm would still be the same. And then looking at some of the cases that the Illinois Supreme Court and appellate court have decided, they've looked at whether the charges are overlapping. That was something that the Illinois Supreme Court said in Spears, which is that, you know, there's not really distinguishable variations of the conduct, but where the charges are overlapping, they're going to view it as one act or course of conduct. And I think there the course of conduct really comes into play. Is there one course of conduct? James putting KR in the room and then giving her the two pills, all to the same course of conduct, which the state didn't disagree with in its brief. It said that James' state of mind, or the thing that he continually said, was that he was trying to get KR to go to sleep that night. And in addition, this court recently decided the Brodersen case, which is persuasive precedent, and there Brodersen was charged similarly to this case where you had a reckless conduct charge and then you had two child endangerment counts that tracked the child endangerment statutes, subparagraph A1 and A2, which is similar to what Your Honor was talking about with how that was charged. There the state confessed error that those were legally inconsistent verdicts, and the state was right to do so in that case. And here, in an analogous on-point situation, the verdicts are again legally inconsistent, and James is therefore entitled to a new trial. Counsel, as to other crimes evidence, you had raised that the focal point of the trial became the other crimes. Isn't Donahoe and its progeny more focused on whether there's a trial within a trial and the other crimes becomes the entire focus? And there are some cases, I know you had cited one, but I think there were 250 other crimes in that case, and how is this case an example where the focal point became such as to distract from the actual crime charge? Of course, Your Honor. Well, there are several points of response. And I think first, as to Donahoe and what the courts have said about other crimes evidence, it's talking about becoming a focal point of the trial. It's something this court recently said in Lamonica as well. You don't want the other crimes evidence to be taken up, you know, close to a majority of what is presented at trial. Here, you're having certainly the first day of trial, the first three witnesses testifying only to this evidence. You're also having an additional officer come in and presenting close to 100 photograph exhibits, which the defense submits that this police officer witness, Mike Novak, was solely an other crimes evidence witness, or at least mostly an other crimes evidence witness. And the result was that many trials, trials within trials, did occur. That was present in this case. There was many trials over the lock outside of the children's bedroom door. There was many trials over the second-degree burns that K.R. received. And so that is something that did occur in this case, and that is part of the error, that there were those many trials. But as to your second point, which is about, I believe, the Cardamon case, where there were, you know, between, I think the court said between 150 and 250 instances of other crimes evidence. What happened in this case, and why this case is similar to Cardamon, is that the state was given carte blanche to just admit whatever evidence they wanted. And the result is that- But they had four sources here. They had the doctor, the neighbor, the teacher, and the police officer. Well, they also elicited or deduced other crimes evidence from Courtney Davidson as well. So that's an additional source. And they asked at least David Angarani, who was another officer- John Cross, Courtney Davidson. No, that was- she was called as a state's witness, and she was given use immunity. Oh, okay. The state was eliciting direct testimony from her. But that's hardly a Cardamon. I mean, Cardamon, you had 158, they said, till 200-some acts. That's a little excessive. Here you had these four people who were talking about crimes that went or incidents that went to the neglect and the endangerment of these children. Isn't it more consistent with Donahoe? No, Your Honor, and I think what's important here is to separate out that there's four- we're talking about four or five or maybe six people versus the number of acts testified to. And here you could have two people testify to hundreds of acts. And what we're submitting here is that the witnesses that were called by the state were testifying to a significantly larger number of acts. And what happened is because the state was given carte blanche to admit that evidence is that they are calling, for example, the primary care physician and saying, how many doctor's appointments did KR miss, and going through all those appointments and calling the school counselor and saying, how many days at school did KR come and her hair wasn't brushed and she wasn't in the right clothes. Was that not relevant? Did the court make the weighing of the balance of prejudice versus probative value? Well, the court is required to make a meaningful assessment and to carefully limit these details. And the point is that because the state is adducing all this evidence and saying, how many days did KR come into school this way? Every day. How many days did you see KR playing in the street unsupervised? Every day. And then going and closing the argument and telling the jury, every single one of these days is an additional piece of this evidence. So your point is that all of that put together puts this in the range of cardamom? Yes, Your Honor. But in addition to finish answering Justice Shostak's question, I think this court needs to look at, for example, at the Perez case, which was from this district and says, did the trial court make a meaningful assessment of the probative value versus the prejudicial effect? Is the evidence narrowed? Is it testified to summarily or is it testified to in detail? And when you compare Perez versus this case, and in Perez the trial judge said, hey, prosecutor, pick four or five examples and you can bring those in. Here in the state, if you look at the court's analysis and the hearing on the other crimes motion, it says that it reviewed the motion in Lemonnet, it said it looked at some submitted case law, and then it says, I think the probative outweighs the prejudicial and it's all going to come in. That's not really a meaningful assessment as to whether this evidence goes to state of mind or to James' state of mind, particularly when the state then gets to bring in evidence, for example, of the Davidson's other daughter taking a knife out of a drawer and chasing Courtney around the house with it. That doesn't have anything to do with James. It doesn't have anything to do with KR. It doesn't have to do with a conscious disregard of known risks? Well, because the case law requires the trial court to make that determination of what's necessary to determine the state of mind, what's necessary to determine the 404B reason we're admitting this evidence. What the trial court could have said is, you know, you have these four or five examples, why are we bringing this in? I'm not going to admit this. This would be a very different case, Your Honor, if the trial court followed the procedure that this court, you know, but that's not what happened. The state was just given carte blanche to admit as much evidence as they could, and they took that and ran with it. So if the court does a meaningful balance and allows it all in, it must have done it wrong? Well, I think, sir, hypothetically, Your Honor, you're asking would be if the court allowed all of this evidence from that meaningful balance. Well, I think that you're still looking at an example where the evidence does tip into becoming excessive with this much evidence. That wasn't the question. The question is, if the court makes a meaningful balance of each issue and says it is all relevant, it is all probative, and I find that the prejudicial value is not outweighed by the probative value, is the court wrong because it finds in favor of the state on each issue? Set aside the excessive issue. But if the court goes through an analysis of all of these events and says, no, these are far more probative than prejudicial, is the court wrong because it let all of it in? I think that if we're putting aside the excessive issue, then, yes, some of this evidence could still be challenged. It's not meeting similarity thresholds. It meets some of the other requirements for the issue. If you're saying that the court mis-evaluated the evidence, your argument is that the court didn't make an analysis. That's different from saying the court did it wrong. In other words, it should have considered it to be more prejudicial than probative. So where do we draw the line in these cases? You follow what I'm trying to say? I believe that, Your Honor. I mean, the problem here is that what courts have said is that this is a difficult line to draw. That being said, it still requires some discretion. It still requires some careful limitation. And I think it's sufficient to say here that that did not occur when the court just said this was all probative over prejudicial without really giving it a meaningful assessment, as Your Honor is suggesting, to an individual thesis of evidence. So rather than look at it all collectively, the court should analyze at least each witness or each event or group of events. Is that your position? I think that that procedure would be better than the procedure that happened in this particular case, or what happened in this trial. Any additional questions? I didn't know if there were any additional questions. You, of course, will have one. I do have one question, just touching briefly on the weight of the evidence here. Is there anything else in the autopsy listed that could have caused her death? Not according to the state's expert, Your Honor. The state's expert who conducted the autopsy said that the external and internal examinations, I don't know the exact jargon, but I suppose showed up normal. The only distinction was that KR had an enlarged heart, and the medical examiner didn't believe that contributed to her death. If I could just conclude on the sufficiency argument, really, the argument before submitted by the defense here is that the state really just proved a number of 720, and that there was nothing else suggesting that, you know, how the amount of pills the state proved James gave to KR would affect that number and how that would have affected KR. The state needed to have put on more evidence showing that there was a contribution to the actual harm that's separate from the mere fact that, oh, there's simply two pills here. There's a qualitative difference between two pills of a medicine and the 50 to 100 pills. But didn't the expert testify that it would affect a child differently? Yes, that was the testimony that, yes, it could affect a child differently, but that was all that was said about that. And there's nothing else to suggest that how that would affect a child differently. The defense's expert does suggest there is some pediatric use of this particular medication, and I think one of the things this court needs to look at is the state's expert, Dr. Albert Rangus, said the equilibrium level of the blood level concentration of this medication is 150. That's after a period of time taking this medication. There's no evidence here of, you know, if you take one pill, how is that going to affect that number? How is it going to make it go up and down? How do you get from 150 equilibrium to a 720? The point here is that if you're taking one of these pills a day, whether you're an adult or even a child, there's nothing here to suggest that two pills are going to make that number spike to 720. Well, there was testimony from the defendant that he gave her two pills, but the jury could have disregarded that. Wasn't there expert testimony that the most likely number was somewhere in the range of 50 to 100? Or 70 was one of the numbers I had seen in the record, right? 70 was the average number. What that particular expert said was that to get to the 720 number, you have to give between 50 and 100 pills with an average of 70, keeping in mind that due to oxidative loss over a week before this was tested, KR's blood level concentration was probably close to 40 percent higher than the actual number that the test result said. The point is here, though, that the state charged James as the principal. They charged him as committing this offense not with Courtney. This wasn't a joint trial, not acting together. They charged him as the principal and as the cause of this harm. And they didn't induce any evidence suggesting that 50 pills were given by James. 50 is different than 2,000. There's malice there. There's something different about giving a person 50 pills. And there's nothing that suggests that James gave those pills on the same night or there's no evidence he would have given those pills in the days or weeks beforehand. The state didn't admit any of that evidence or find any of that evidence. It really just said we have these two pieces of evidence. It looks at these two pills. We have this statement that he gave her, these two. And it went forward on an involuntary manslaughter charge on that basis. But there, there's nothing to suggest, or excuse me, there's nothing in the record that says from the expert that these two pills would have caused this harm. These two pills were- That's why I asked you in the beginning, was there anything else listed in the autopsy that could have caused her death? Anything? No. The answer is no, correct? Not from the autopsy. But what could have caused the death is a higher number of olanzapine in the system, this blood level concentration. But there's no actual testament of how those two pills would change that analysis. But you're relying on the fact that the defendant told us the absolute truth, only two pills were ever given to that girl. And the jury could have disregarded that and determined a number somewhere between two and 100. Was that not the province of the jury? No, this is what the state said was the absolute truth, was James' statement. The state said, look at this entire video of James, look at the end of the video, this part where he says two pills is the absolute truth. That's what the state said that they proved. And I don't think that the jury could have completely disregarded this testimony because you also have to consider the state put on the testimony of Courtney. We're not talking about one actor here. We're talking about two actors who gave the same substance to KR. And so the jury can't simply just disregard the fact that Courtney also admitted to giving these pills. What they're doing is making a determination of, you know, and the elephant in the room here is that this child took much more, many more pills than either James and Courtney admitted to. But there's no evidence that fills that gap that gets from James' 2 to 50 or Courtney's 3 to 50. There's something missing there. The jury can't simply disregard what Courtney said. And the state needed to put on at least something that would suggest that James was acting, or that he gave more pills, or that he had that state of mind. We submitted a brief, listen to the 911 call. These are not parents who were acting with malice to intentionally murder a child. These were parents who, you know, gave this medication to this child and were horrified to see the result. This medication was not prescribed to the child. This medication was not prescribed to the child, Your Honor. Any additional questions? I have none. Any additional questions? You will have an opportunity for a response. Thank you, Your Honor. Counsel? Good morning, Your Honors, and may it please the Court. The jury in this case returned consistent verdicts when it found that the defendant was guilty of both endangering the life or health of a child and involuntary manslaughter, where the offenses consisted of multiple acts with different mental states. But aren't they two different mental states? They are. Isn't it one act? No, Your Honor. Given the totality of the evidence that was presented, there was acts that occurred within, if the Court has conceptualized the crimes that occurred in this case, in a much larger timeframe, in a larger continuum. The knowing act of having given K.R. the Olazapine medication, which the defendant testified he did that for the purpose to make her go to sleep. He knowingly gave her that pill. That is one knowing act. And then expand it out, including the other crimes evidenced and the evidence that occurred before the giving of the medication and afterwards were reckless acts. As this Court has indicated previously in Peeble v. Roman, as well as in Norris, you can have variations in that conduct. In Roman, the defendant was found guilty of both aggravated battery and reckless conduct, and the Court indicated the defendant acted recklessly when he fired initial shots at the victims and then subsequently knowing when he knowingly shot the victim down on the ground. Let's talk about this case. You said that there were reckless acts prior and subsequent to. Talk to us about those acts. Sure, Your Honor. Regarding the separate acts, the recklessness occurs when the Court looks at the testimony of Mrs. Davidson and how it impacted the defendant's actions. Specifically, Mrs. Davidson indicated that she had given the victim medication at 11 o'clock, then she indicated an hour later in the record that she gave the victim more medication, and then subsequently the defendant gave medication between 3 or 4 a.m. Mrs. Davidson's testimony was, per her statement, that between 12 a.m. and 3 or 4 a.m., she specifically told the defendant, I've given KR pills that make her sleep. She indicated multiple times that she represented that fact to the defendant, and he further provided her with Olazapine. He also indicated in the testimony that he picked up the pill bottles off the ground and that it was a regular pill bottle. The photographic evidence at 107 and 110 in the evidence indicates that those bottles were the standard kind of brown bottle, and they indicate give one pill before bedtime. How is that reckless? That's an intentional knowing act. If she said to him, I gave her two pills, and four hours later he goes and gives more. How is that reckless? Your Honor, it's reckless because it's axiomatic that giving a child unprescribed adult medication, psychotropic medication, is a reckless act. Why isn't it a knowing act? Excuse me? Why is that not a knowing act? He goes in there, takes two pills out of the bottle, and gives them to her, I think in cottage cheese or something. That intended to do that. It wasn't a mistake. Absolutely. That specific act was knowing, specifically because of that reason, because his actions within that small cutout time frame were knowing acts. He crushed up the pills for the purpose of concealing the medication, making it more easy for the victim to consume it. That act was done knowingly. What act is different that caused the recklessness? The different acts are that following the defendant giving medication, he learns that his wife also gave medication. He then provided knowingly the victim the medication, but then subsequently did not engage in any activity to mitigate the harm that he had just compounded by. And furthermore, subsequently the next day, he doesn't check on the victim. The testimony, which the jury, I think, reasonably couldn't. Wait a second. You're saying that any time you don't go in and see if a sleeping child is still sleeping, that's a reckless act? When you give a child adult dosages of an antipsychotic medication after knowing that your wife did as well, and you do not check on the child the next day, that is a reckless act as well. Do you charge it that way? So the reckless act is charged with the giving of the lesbian medication. Which is the same that was alleged in the knowing act, correct? Not correct, Your Honor. The knowing act was both giving access to it as well as the giving of the medication. So hold on, counsel. Count one is the involuntary, gave KR pills. Count two is the endangering and gave KR pills. Count three is the second endangering, which is allowed access. So if you're talking about count one versus count three, I can understand how you might have separate acts in actually administering a medication and then leaving something out. But doesn't the fact that you have a general verdict on those two endangering counts cause us to have only the same act? No, Your Honor, because in regards to the access act, that was a more sort of just conceptualized crime, that placing KR into that room near the lesbian was by itself endangering to her, separate from the giving of the medication. Right, I understand that. But you have a general verdict on those two alternate theories on the endangering. So if you only had count one and count three, I can see how you might be able to argue two acts. But when you have a general verdict on the two endangering and one of them is directly giving pills, is that not the same act as the directly giving pills under the manslaughter? It would be, Your Honor, but, again, the point is the mental states and the difference in the conduct that occurred before and after, in regards to the reckless, makes it more encompassing than the more narrow act within the time frame of the defendant giving the pills between 3 and 4 a.m., which is the knowing act that occurred. I'd like to address counsel's argument regarding the other crimes evidence because I think the court spoke at length about this issue and I did at one discussion. In regards to the trial court properly exercised its discretion in admitting the other crimes evidence for the purpose of proving the defendant's intent and mental state. The defendant indicates at the court below it provided the state of carte blanche to admit that that's just not the case. And defendant's discussion regarding Cardamon, I think, misinterprets that case entirely. The issue in Cardamon was that the defendant argued that the events that had never occurred at all, and so the court initially indicated that admitting them to show intent was inappropriate while ultimately indicating the evidence was relevant for propensity because it was seeking admission under Section 115.7.3. And this court indicated while the trial court had considered the prohibitive prejudice analysis related to 7.3 regarding proximity and factual similarity, the court didn't consider the relevant facts and circumstances pronged. And specifically how this case is distinguishable from Cardamon is that this court indicated that in Cardamon the acts themselves could have been more narrowly or concisely discussed by only a few of the witnesses and by only a few descriptions of the conduct, not the more extensive conduct. What's separate and different here is that the kinds of risks that the other crimes evidence spoke to were separate and different such that it was proper for the trial court to admit them because it indicated and showed proof of defendant's mental states. Separate and different, but still repetitive. Oh, how many times did this happen every day? What does every day mean? 364 per year? Do we count those? Every time a witness said that happened every day, how many years do we count? How many events is that? Your Honor, I think the way this evidence was presented, the nature of the risks is the core point, and I don't think getting into analysis saying was this what was going on. But that's exactly what Cardamon did. It said that was too many. That was too many events that were placed before that jury. The issue with Cardamon was too many events of the same kind of fun, the touching in regards to the gymnastics coach. Well, that's what Cardamon was all about. Exactly, but the difference here is that the risks that occurred and the evidence that the state presented were not once in a lifetime touching. There were multiple different acts. Were they all similar, though? No, Your Honor. Were they all evidence of neglect? Different versions of neglect so that the state, excuse me, the jury could properly understand. But if the witness testifies the child was unsupervised in the front yard by the road every day, how are those acts different? Unsupervised by a road. 364 times. How are those different acts? The difference of the acts was that in addition to the unsupervision regarding being left outside in the cold and interacting with fireworks, there was also different risks discussed through the testimony of Dr. Kadakia regarding the disregarding of health issues with the child, failing to mitigate injury that occurred to the child, which was then separate from itself of the health and well-being risks that the school psychologist testified to. On that point, how many of these other incidents are attributable directly to this defendant versus Courtney? I believe the testimony regarding unsupervised activity. There was reference in the record that the defendant was home during some of the testimony that the neighbor had heard a male voice at the time and that the children were allowed to still roam free unsupervised. So those are attributable. What about the rest of them? So the medical testimony from Dr. Kadakia was that both the defendant and his wife were responsible for the care and well-being. I think also the school psychologist testified that both parents would drop off the child at home. So in that same way, there's testimony that it was the responsibility of both of these people. But secondly, the law also recognizes that parents are responsible for the care and well-being of their children. It's not enough for the defendant to say, well, my wife did this. Well, this was in my wife's shop. The defendant, as the stepfather, was independently responsible for the care and well-being of K.R. And through the other crimes evidence, it showed that he engaged in an abandonment of her health and well-being and engaged in neglect in multiple instances. All right, so the house is filthy and the officers testified as to it being the worst house they've seen. Did we need, how many, were there 90 photos of the house? Did we need all of those and do all of those go to state of mind in terms of recklessness or intent at whatever level? How much of this is actually relevant or necessary to these points? I think it was all relevant and necessary, Your Honor. The trial court, you know, initially during the motion to eliminate hearing heard arguments regarding this information. It balanced that. It found that they were more probative than prejudicial, excuse me. Specifically, the photographic evidence and the testimony from Detective Novak included the evidence of the numerous hazards that occurred within the home, the multitude of pill bottles that were left out, the unsanitary and squalid conditions, the risks to injury within the home, things left out that easily could have harmed the child. Just as in People v. Melton, that testimony came in because it showed the defendant made a conscious choice to allow his home to fall into a state of disrepair. And as the defendant sought at trial to deflect responsibility by blaming DCFS or indicating that his wife had Guillain-Barre syndrome and therefore she couldn't maintain the home, it went to speaking to his mental state because the defendant, as I indicated previously, was independently responsible for the care and well-being of his children, independently responsible for the home in which they reside, for the manner in which they are housed and fed and cleaned and the conditions that they live in. And his conscious choice, quoting that language from Melton, indicated that he endangered the child by placing where he stands, by allowing them to live in this home in this squalor. And so it was all relevant came in. And contrary to my friend on the other side's argument, it didn't become a mini-trial. The testimony was from Detective Novak. He was the evidence technician. He's the one who went in there. His testimony would have logically been admissible to speak to these issues, discover the pills. It would have also been, I would argue, it also would have been inconsistent to have just testimony of the room and see that squalor and the jury not understand, well, what's going on here. It provided context to the home, the manner in which the detectives found the victim. As the court, I'm sure, has reviewed those photos, they were graphic, but they showed both the exact environment where the victim was found and the conditions of that immediately around her, and then more expansively, the home in which she did die, which the trial court found was ultimately relevant and admissible as other crimes evidence. And they went back to the jury during deliberations? I believe they did, yes, Your Honor. I want to give you time to address the causation arguments of your opponent. First, let's start with the number of pills. The defendant eventually admits to two. Defense argues it had to be 70. So what's the State's position on causation there? So the State's position is that we didn't need to prove the exact amount of pills. This was presented in a contributing cause type analysis, which indicated that the defendant provided those pills, and that was the manner in which causation was presented. Contrary to the defendant's expert at trial, he indicated that he just pulled out the number 70 to 100. His analysis was completely devoid of any real scientific finding. The basis for how he determined this was a vague generalized calculation, and the number that was referenced earlier, 70 to 100 pills, was a number he just crafted or, you know, created out of thin air. Dr. Alvarado testified that there is no consistent way to determine the amount of pills that would have caused a toxic dose, given the lack of information regarding consistent rates of absorption and the testimony regarding that. But Dr. Alvarado did testify that it was a landscape in toxicity, which was the cause of death, and that the defendant's giving of that pill contributed to that. And our Supreme Court articles of review that the people cite in their brief indicate that evidence is sufficient in and of itself to convict from involuntary manslaughter. Therefore, Your Honors, for the reasons argued in our brief as well as today, we'd ask that you affirm the defendant's convictions and sentence. Any additional questions? Any additional questions? Thank you for your argument. Thank you, Your Honor. Your Honors, I'd like to start by clearing up some of opposing counsel's points on the legally inconsistent verdicts. And to start with opposing counsel's contention that there were other variations in conduct that the jury could have relied on to determine whether or not the defendant was guilty. The point here is that the state didn't do that trial. This was a death-focused prosecution for a sole act or course of conduct. And this is the first time the state has addressed to this forum that there was sufficient differences in this conduct that could support multiple acts. The case law is very clear that you can't do this on appeal. You have to start by doing this in trial court. In addition, I just want to follow up on that. Counsel, just on that point, if we had only before us count one and count three, could those have both gone to the jury under the theory that the giving is different from the allowing access? Well, in this actual instance, Your Honor, we could not because the state charged us with a sentencing enhancement requiring it to prove as an element that James' act caused Kara's death. If the state didn't include that sentencing element and this was simply a class A misdemeanor endangerment charge, then I think yes, but that's not what happened in this case. And in addition, to follow up on Justice Kennedy, you asked about the general verdict. I think this Court does need to keep in mind that while there was a count two and count three, the state never made any variation between those counts at all during the trial. The jury was told that James was just charged with involuntary manslaughter and child endangerment, and there was a single verdict. There wasn't an attempt at the trial to distinguish between counts two and three. They were the same for the trial purposes, and that is one of the reasons why this was a legally inconsistent verdict. I would like to also address some opposing counsel statements on the other crimes evidence. With all due respect to the state and to opposing counsel, he is pointing out the conduct of James and pointing out the other crimes evidence, but not really addressing the actual other crimes analysis the defense submits. By saying that there's testimony from Dr. Kodaki of a family care physician that I could tell you that there was also testimony from James' video that he wasn't an adoptive parent of K.R. He couldn't take every single appointment. But this is the problem with the amount of evidence here and with the Court not carefully limiting the details, is now we're having a mini-trial about, well, could James take K.R. to all these appointments? Kodaki also testified she didn't know when James and Courtney married, but that K.R. missed several appointments in her first year of life. So, again, we're seeing that the result of omitting this much evidence without the appropriate discretion is that there is, you know, mini-trials. And I could go on. Was there a cross-examination with respect to that, counsel, by the defense? Well, there was cross-examination on several of the other crimes items, Your Honor. But the point is, is that then becomes a mini-trial because now we're arguing, well, for example, the neighbor testified she heard a male voice inside the house sometimes when the kids were playing outside. But now the defense has to bring in evidence that, well, James left for work early in the morning, and sometimes he was at work. Or that K.R., the parents missed a parent-teacher conference, so the teacher went to do the conference at the house. And, well, James wasn't there, but he was also at work. So, yes, there is cross-examination on some of these matters. But the cross-examination's purpose is to bring in the contrasting evidence for the trials within the trials. And that's part of the issue here is the court needed to limit that. My question is, was there cross-examination? Because I honestly don't recall regarding the fact that he was not an adoptive parent. There was no cross-examination regarding he was an adoptive parent. That was simply a statement from the video interview with Detective Harrell. Thank you. And then to conclude on the sufficiency of the evidence claim, just to be very clear, this was not a case of dueling experts. This was not a case where the jury would have gone back to deliberations and weighed O'Donnell versus Alvarenga, because if you look at the testimony, there's nothing that O'Donnell and Alvarenga say that's actually in disagreement with each other. The state, conceivably, does a very good job of limiting O'Donnell's testimony. I don't know if he was there to provide an ultimate opinion. He didn't. He ended up saying and corroborating everything that Alvarenga said. And he did not pull a number 70 out of nowhere. This wasn't a fictional number. Just to conclude the thought, he was an expert admitted in pharmacology, and he didn't say that this was the exact amount for KR. He said this is an average and a hypothetical. I know how to do this calculation in the course of my expertise, and this is the average range. So that's where that number is coming from. And just to conclude, this Court should reverse James' conviction outright. In the alternative, this Court should find James as entitled to a new trial and grant one and remand with directions to limit the amount of other crime evidence submitted. Thank you. Thank you. Thank you both for excellent arguments this morning. We are adjourned for the day. Thank you.